

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-08-00006-CR

_____

JOHNATHAN TOLIVER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 241st Judicial District Court
Smith County, Texas
Trial Court No. 21-0130-07

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

As he sat in his Smith County jail cell, Johnathan Toliver's outlook for the future was decidedly bleak. He had been arrested for three incidents of delivery of cocaine; two of these charges were first-degree felonies and one was a second-degree felony. The cases appeared quite strong because law enforcement officers had used Jimmy Wallace as a confidential informant and had made video recordings of each of these incidents, during which Toliver had sold Wallace cocaine. Toliver's predicament in regard to the pending charges was exacerbated by the fact that he had previously been convicted of a felony assault; when these new charges arose, the State could use Toliver's prior conviction for enhancement purposes. Considering the strength of the cases, the multiple charges pending against him, and the previous felony conviction, Toliver was faced with the potential of receiving as much as two life sentences, plus a twenty-year sentence.

The State maintained that Toliver concocted a plan to ameliorate the problem. The plan involved a plot by Toliver and others to have Wallace killed, silencing him forever. After the scheme was discovered, Toliver was charged with a conspiracy to murder Wallace, tried before a Smith County jury,[1] convicted, and sentenced to life imprisonment, plus a fine of $10,000.00. It is from that conviction that Toliver now appeals.

---

[1]This case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Vernon 2005). We are unaware of any conflict between precedent of the Twelfth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

Toliver's appeal claims the trial court erred in allowing detailed evidence about the drug transactions; in denying a continuance during trial; and in denying Toliver his right to confront a co-conspirator or accomplice witness. We affirm the trial court's judgment.

**1.    Extraneous-Offense Evidence**

Toliver first complains of the trial court 's admission of extraneous-offense evidence. The evidence of which Toliver complains regarded three sales of crack cocaine during which Wallace acted as a confidential informant.

A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005); *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002). A trial court does not abuse its discretion so long as the decision to admit evidence is within the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). An appeals court may not substitute its own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). If the record supports the trial court's decision on the admission of evidence, there is no abuse of discretion, and the decision of the trial court will not be reversed. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002); *Montgomery*, 810 S.W.2d at 379.

Although the general rule is that evidence of extraneous crimes is not admissible, that evidence can be admitted if it satisfies the requirements of the following two-pronged test: (1) the offense is relevant to a material issue in the case, other than the issue of the defendant's character;

3

and (2) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Prieto v. State*, 879 S.W.2d 295, 297 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd). The material issues in each case are determined by the respective theories proffered by the State and the defense. *See Bush v. State*, 958 S.W.2d 503, 505 (Tex. App.—Fort Worth 1997, no pet.). For example, evidence of extraneous crimes may be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Tex. R. Evid. 404(b). If an objection is made to the admission of extraneous-offense evidence, the proponent of the evidence must then meet the burden of persuading the trial court that the evidence has relevance apart from character conformity, that it tends to establish some elemental fact (such as identity or intent), that it tends to establish some evidentiary fact (such as motive, opportunity, or preparation leading inferentially to an elemental fact), or that it rebuts a defensive theory by showing the absence of mistake or accident. *Id*.

### A) Admission of Evidence of Toliver's Extraneous Offenses

In May and June 2006, Toliver sold crack cocaine to Wallace, who was working as a confidential informant for the Tyler Police Department. (Toliver does not contest the allegations of delivery of controlled substance.) These deliveries formed the bases for three indictments, in which Toliver was charged with delivery of a controlled substance, less than one gram; delivery of a controlled substance, four or more grams but less than 200 grams; and delivery of a controlled substance, one or more grams but less than four grams. The first indictment alleged that the offense

4

had been committed within 1,000 feet of a playground and that Toliver had a prior felony conviction for aggravated assault. The second indictment also alleged as an enhancement the prior felony conviction for aggravated assault. Thus, the indictments presented one second-degree felony and two first-degree felonies. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112 (Vernon 2003), § 481.134 (Vernon Supp. 2008); TEX. PENAL CODE ANN. § 12.42(b) (Vernon Supp. 2008). The State offered video recordings of the three drug sales, the actual crack cocaine which had been sold and purchased, testimony from a Texas Department of Public Safety chemist establishing that the substance the subject of these sales was actually cocaine, and testimony from confidential informant Wallace regarding the transactions. Toliver argues that the indictments were sufficient evidence for the State's evidentiary burden and that the additional evidence was neither required nor warranted.

The State claimed to the trial court that evidence of Toliver's sale of crack cocaine was admissible as evidence of his motive to conspire to have Wallace killed. The State pointed out that Toliver was under indictment for two first-degree felonies and a second-degree felony; he, therefore, faced the possibility of two life sentences and a sentence of up to twenty years. The State also introduced a judgment revoking the community supervision on Toliver's previous conviction for aggravated assault (which precluded a grant of community supervision from any range of punishment should Toliver be convicted of one or more of the drug delivery charges). The State argued that the seriousness of possible penalties in those cases furnished Toliver's motive for the conspiracy.

5

As stated above, motive is one of the possible bases for admission of extraneous-offense evidence. *See also Williams v. State*, 974 S.W.2d 324, 331 (Tex. App.—San Antonio 1998, pet. ref'd) (evidence of Williams's gang affiliation admissible to prove motive, where motive for robbery was to acquire guns to arm gang). The Texas Court of Criminal Appeals has addressed a similar situation in *Russell v. State*,[2] wherein the appellant was convicted of capital murder. The State alleged that Russell killed a confidential informant with whom Russell was in a relationship. The State's theory was that Russell killed the victim in retaliation for her having introduced Russell to an undercover police officer to whom Russell then sold crack cocaine. *Id.* at 177–78. Russell pled guilty to delivery of a controlled substance; the trial court granted Russell's request to delay execution of the ten-year sentence received by him in that case. Shortly thereafter, the victim/informant was slain. At Russell's capital murder trial, the State admitted into evidence several photographs related to the arrest and conviction for delivery of a controlled substance and questioned Russell about them. Russell admitted that the drugs in one of the pictures were the drugs he had sold to the undercover officer. In rejecting Russell's appellate complaint that the trial court erred in admitting cross-examination on this evidence, the Texas Court of Criminal Appeals said:

> These questions, and the photographs on which they were based, were about the offense of cocaine delivery to Bush for which the appellant had been indicted and convicted before the murder--the offense that began when Brewer cooperated with Officer Bush by introducing him to the appellant. The indictment alleged that it was in retaliation for that act of cooperation that the appellant killed Brewer. This was not an irrelevant, extraneous offense that showed only that the appellant was a

---

[2]155 S.W.3d 176 (Tex. Crim. App. 2005).

6

criminal generally. There was no error in the admission of the two photographs or the cross-examination during which they were admitted.

*Russell*, 155 S.W.3d at 183. We find that the decision of the trial court to admit the extraneous-offense evidence regarding Toliver's drug sales lay within the zone of reasonable disagreement (*see Montgomery*, 810 S.W.2d at 391) and, accordingly, the trial court did not abuse its discretion in admitting same.[3]

### B) Texas Evidence Rule 403 Balancing Test

After finding the trial court did not abuse its discretion in admitting the extraneous evidence, we next review the trial court's balancing of the prejudicial nature of this evidence against its probative value. *See* TEX. R. EVID. 403; *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999). In evaluating the trial court's determination under Rule 403, a reviewing court is to reverse the trial court's judgment "rarely and only after a clear abuse of discretion," recognizing that the trial court is in a superior position to gauge the impact of the relevant evidence. *Mozon*, 991 S.W.2d at 847 (quoting *Montgomery*, 810 S.W.2d at 389).

The relevant criteria in determining whether the prejudice of an extraneous offense substantially outweighs its probative value include:

---

[3]Also, any extraneous-offense evidence may not be considered by the jury unless there is sufficient evidence to support a finding the defendant committed the extraneous offense beyond a reasonable doubt. TEX. R. EVID. 104(b); *Harrell v. State*, 884 S.W.2d 154, 160 (Tex. Crim. App. 1994) ("[I]n deciding whether to admit extraneous offense evidence . . . the trial court must, under rule 104(b), make an initial determination at the proffer of the evidence, that a jury could reasonably find beyond a reasonable doubt that the defendant committed the extraneous offense.").

(1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable--a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense;

(2) the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way";

(3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; [and]

(4) the force of the proponent's need for this evidence to prove a fact of consequence, that is, does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.

*Id.* (citing *Montgomery*, 810 S.W.2d at 389–90).

## Factor 1: Did Extraneous-Offense Evidence Make a Fact of Consequence More or Less Probable?

The State offered evidence of Toliver's drug sales and of his prior conviction of aggravated assault to prove his motive for conspiring to kill Wallace. The fact that Toliver faced indictments with the possibility of two life sentences and another sentence of up to twenty years, and was ineligible for community supervision, provided Toliver with a strong motive to kill Wallace. Wallace was a significant, if not indispensable, witness for the State in its prosecution of those charges; the promise of his unavailability as a witness would give Toliver strong impetus to do away with Wallace.

We find the evidence of Toliver's sales of cocaine was relevant to the issue of Toliver's motive to conspire to kill Wallace. There was substantial evidence of Toliver's guilt in the delivery

8

of controlled substance cases, which would have subjected Toliver to some of the highest penalty ranges available under Texas law; Wallace's potential testimony would have been an integral part of any successful prosecution of those cases. This factor weighs in favor of the admission of the extraneous-offense evidence.

**Factor 2: Potential to Impress Jury "In Some Irrational but Nevertheless Indelible Way"**

Obviously, it is a core principle of our criminal justice system that a defendant has a right to be tried only for the charged offense and not for his or her general predisposition as a criminal. *See generally* TEX. R. EVID. 404(b) (prohibiting use of extraneous offenses to prove character and subsequent conduct in conformity with that character); *Ford v. State*, 484 S.W.2d 727, 729 (Tex. Crim. App. 1972) (holding extraneous-offense evidence must be relevant on some theory other than general proposition that one who commits one crime is prone to commit another). Here, evidence of Toliver's serial drug dealing had a significant potential to inflame the jury's perception of Toliver as a criminal in general. During the trial from which this appeal has been taken, the State established Toliver's history as a criminal in general: at least three pending cases of trafficking in cocaine and one adjudicated instance of aggravated assault. Taken in conjunction with the charged crime of conspiracy to commit capital murder and the fact that several of the State's witnesses were prison or jail inmates relating statements made to them by Toliver while incarcerated with him, there was a substantial amount of evidence before the jury which could very well have affected its view of Toliver in an irrational or indelible manner.

9

In *Montgomery*, the keystone case for Rule 404(b) and 403 analysis, during Montgomery's trial on charges of indecency with a child, the State introduced evidence that Montgomery walked nude around the house with an erection. Finding the extraneous-offense evidence of walking around with an erection to be more prejudicial than probative, the court explained that

> [t]hough relevant, such evidence has only marginal probative value. By contrast, the danger of unfair prejudice from such testimony is substantial. Both sexually related misconduct and misconduct involving children are inherently inflammatory. Many in our society would condemn appellant for his conduct whether they believed it showed sexual arousal directed at his children, an undifferentiated sexual arousal imprudently displayed, or simply an incidental erection coupled with a damnable nonchalance. In any event there was a grave potential for decision on an improper basis, as jurors may have lost sight of specific issues they were called upon to decide and convicted appellant out of a revulsion against his parental demeanor.

*Montgomery*, 810 S.W.2d at 397.[4]

More recently, the Texas Court of Criminal Appeals re-examined this factor in light of the United States Supreme Court's post-*Montgomery* opinion in *Old Chief v. United States*, 519 U.S. 172 (1997), and incorporated a quote from *Old Chief* in its opinion: "the term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."

---

[4]*Compare Russell v. State*, 113 S.W.3d 530, 544–45 (Tex. App.—Fort Worth 2003, pet. ref'd) (evidence of gruesome robbery and murder, along with graphic depictions of sexual assaults during offense, which were "more heinous" than offense for which Russell was being tried, "very likely impressed the jury in some indelible way" to convict appellant for extraneous offense); *Taylor v. State*, 93 S.W.3d 487, 504 & 506–07 (Tex. App.—Texarkana 2002, pet. ref'd) (holding trial court abused discretion under Rule 403 by admitting despicable story written by defendant about "sex enjoyed by men and women with both willing and unwilling young girls" in prosecution for possession of child pornography).

*Manning v. State*, 114 S.W.3d 922, 928 (Tex. Crim. App. 2003) (footnote omitted).[5] Ultimately, in *Manning*, the Texas Court of Criminal Appeals determined that this factor did not weigh against admission of the evidence that Manning had a cocaine metabolite in his blood after the accident which formed the genesis of the manslaughter charge against him. Because the indictment had alleged that Manning's recklessness was caused by the consumption of a controlled substance, evidence that he had consumed cocaine was pertinent to an allegation in the charging instrument. *Id.* at 927. Therefore, reasoned the high court, the evidence "was not unfairly prejudicial." *Id.* at 928. "It did not have a great potential to impress the jury in an 'irrational' way. Although there was some risk that the jury would convict Manning solely because it believed he was a cocaine user, that risk did not substantially outweigh the probative value of the evidence." *Id.*

We find Toliver's situation distinguishable from that in *Manning*. Although the consumption of a controlled substance was pertinent to an allegation in the charging instrument in *Manning*, motive is not an element in the charging instrument in Toliver's indictment for conspiracy to commit murder. While motive is not an element which must be proven in Toliver's case,[6] it is, nonetheless, an appropriate and permissible area of evidence. Still, the Texas Court of Criminal Appeals's analysis of this factor in *Manning* relied heavily on the relation of the evidence (cocaine metabolites

_____

[5]*Manning* reversed this Court's decision, at 84 S.W.3d 15 (Tex. App.—Texarkana 2002), where we found harmful error in the trial court's admission of the cocaine metabolite evidence. On remand, we affirmed the trial court's judgment. *Manning v. State*, 126 S.W.3d 552 (Tex. App.—Texarkana 2003, no pet.).

[6]*See Farrington v. State*, 489 S.W.2d 607, 610 (Tex. Crim. App. 1972).

11

found in Manning's system) to part of his charged offense.[7]  Here, such a relation is not present.

There was a substantial amount of evidence presented about Toliver's drug dealing, and a significant amount of trial was spent presenting this evidence.  We find evidence of Toliver's history of drug dealing had at least the potential to unfairly prejudice the jury.  Therefore, this factor weighs against admission of the evidence.

**Factor 3:  Amount of Time State Spent Developing Extraneous Evidence**

The State's case-in-chief at the guilt/innocence phase of Toliver's trial took three days; on the fourth day, Toliver presented evidence and closing arguments were presented.  In about 408 pages of record testimony,[8] approximately 92 pages of testimony centered on the extraneous offenses.[9] Thus, about 23% of the State's case centered on the extraneous offenses.  Additionally, the State played three videos of the drug transactions.  These aggregate to approximately sixty-seven minutes.[10]

---

[7]*Manning*, 114 S.W.3d at 928 ("Although there was some risk that the jury would convict Manning solely because it believed he was a cocaine user, that risk did not substantially outweigh the probative value of the evidence when the evidence specifically pertained to an allegation in the indictment.").

[8]We have only counted direct and re-direct examination by the State, and tried to exclude lengthy bench conferences and arguments from our count.

[9]This includes about six pages of testimony comparing Toliver's fingerprints with those on his judgment for aggravated assault.

[10] However, some twenty-three minutes of the longest recording shows nothing more than Wallace sitting alone in a motel room.  Further, it is not possible to determine from the record how much of each of these recordings was actually displayed to the jury.

12

As discussed above, this Court's decision in *Manning* was reversed by the Texas Court of Criminal Appeals. In examining this factor in *Manning*, we found that about one-fifth of the trial was spent proving the presence of cocaine metabolites in Manning's system. *Manning*, 84 S.W.3d at 23. Here, we find that just over that amount, 23%, of the trial testimony was spent on the extraneous-offense evidence. We add to that the length of the video exhibits. The Fort Worth Court of Appeals found that where almost 30% of trial was spent on one extraneous offense, such time weighed against the evidence's admission. *Russell*, 113 S.W.3d at 546.[11] While bearing in mind the complexity and difficulty of proving conspiracy, we nonetheless find that the amount of time used to prove the extraneous offenses here weighs against their admission.

**Factor 4: Proponent's Need for Evidence of Extraneous Offense**

The State's burden was to prove beyond a reasonable doubt that Toliver was guilty of conspiring to kill Wallace. Direct evidence is rarely available to prove a conspiracy hatched in secret; circumstantial evidence, including the conspiratorial conduct, must be relied on to prove the essential elements of the crime. *Farrington*, 489 S.W.2d 607; *Caddell v. State*, 865 S.W.2d 489, 492 (Tex. App.—Tyler 1993, no pet.). The State did have witnesses who testified to statements made by Toliver to the effect he wanted Wallace dead. For example, Richard Keith Lawson testified that, for a time, he shared a cell with Toliver. Lawson further testified that Toliver had asked him how he would kill a man if he were paid to do so and that Toliver wanted Wallace dead so Wallace could

---

[11]In *Russell*, about 19% of trial was spent addressing a second extraneous offense, the admissibility of which was not challenged.

not testify against Toliver. Another inmate who had been incarcerated with Toliver, Ronnie Caddell, testified Toliver said to him that Toliver was going to "take care" of Wallace and that Caddell thought Toliver was serious about killing Wallace. Caddell said that he had seen Toliver talking with Lawson in the jail. In addition, several witnesses testified that Toliver possessed a cellular telephone while in the jail and he had been seen and heard using it. Jonathan Brown testified that Toliver used a cellular telephone while in jail to call Brown; when he did so, Toliver said he knew that Wallace was a witness against Toliver and that Toliver wanted to kill Wallace. A jailer, indicted as a co-defendant, admitted that she had printed a picture of Wallace from the jail's book-in system and had given it to Toliver. There was also evidence adduced from Brown regarding efforts taken by Toliver and his mother to bond out of jail another co-defendant, and then bond out Wallace himself. When Brown was arrested, he and another co-defendant were in Toliver's mother's car. Brown testified that Toliver's mother gave him permission to use the car that day and about three weeks prior, she had posted bond for another of the co-conspirators.

Another factor to consider was the issue of just how vital Wallace's testimony was to the prosecution of the drug cases. Wallace, Toliver, and the State were all aware of the integral and critical role which Wallace's testimony would play in such a prosecution. The sole way that the jury in the conspiracy to murder case could grasp the necessary part which Toliver knew Wallace would have played in the prosecution of the drug cases would have been to lay the State's cards in those cases face up. In so doing, the jurors could then appreciate the need which Toliver felt to remove

this necessary link in the State's case against him. Toliver takes the position that a simple introduction of copies of the indictment against him would have sufficed to show the motive here; that would not take into account the importance of Wallace to that prosecution and, hence, Toliver's belief that his freedom might hinge on silencing Wallace.

As stated earlier, because of its generally secretive nature, conspiracy is often a difficult crime to prove and that while it is not necessary to prove the motive giving rise to a crime, it is a permissible area of evidence. Looking at the record as a whole, we find the State's need for this extraneous evidence was real, though not absolutely vital. There appears to be a slight weight in favor of admission of the evidence.

However, it is the questionable need of the State for the evidence in dispute that leads us to conclude the trial court did not abuse its discretion in admitting it. While we have concluded the State had other competent evidence tending to prove the conspiracy, we cannot say that the State did not have some need for this evidence, especially considering the degree that the harsh penalties to which Toliver was susceptible for the delivery charges would serve as motive for the conspiracy and the integral part which the proposed victim of the murder plot would have played as a witness in Toliver's pending trials. That said, we are not in a position to determine which parts of the evidence should have been excluded. While it may have been prudent, for example, to admit testimony of the delivery cases but not the video exhibits, or the actual cocaine itself, or the chemist's testimony that the substance sold was, indeed, cocaine, it is precisely those kinds of decisions which were plainly

15

in the trial court's discretion. On several occasions, in answer to Toliver's objections, the trial court explicitly stated that it had performed the balancing test required by Rule 403 and had found the evidence admissible. As the Texas Court of Criminal Appeals stated, citing the United States Supreme Court, in *Manning*, it is the danger of *unfair prejudice* which controls the balancing test.[12]

Here, reviewing the record as a whole and giving due deference to the trial court, we cannot say it abused its discretion in finding the danger of unfair prejudice did not substantially outweigh the probative nature of the State's proffered extraneous-offense evidence.

We overrule Toliver's first point of error.

## 2. No Error Where Trial Court Denied Request for Continuance

Toliver's second point of error complains that the trial court erred in not granting a continuance during trial. We find this point was not preserved for our review and overrule it.

One of the State's witnesses was Brown, a co-defendant and indicted co-conspirator. Brown testified that he had worked for Toliver, selling drugs. Brown admitted his participation in the conspiracy. Brown said that while Toliver was incarcerated, Toliver had called him on a cellular telephone. During that conversation, Toliver told Brown that he knew that Wallace was the confidential informant on Toliver's delivery cases and that the only way Toliver could avoid conviction on those cases was to have Wallace "murked off" (murdered). Toliver also related to Brown that he, Toliver, had arranged for a person to kill Wallace. On the day Wallace was released

---

[12]*Manning*, 114 S.W.3d at 928 (citing *Old Chief*, 519 U.S. at 180).

16

from jail on bond, Brown and another co-conspirator, Jesse James Jackson (who had previously been bonded out by Toliver's mother), were driving in Toliver's mother's white Cadillac. Brown testified he was the only person Toliver trusted to drive his mother's car. Wallace saw the white Cadillac driving around the jail after he was released from jail and recognized Brown and Jackson in the vehicle. Wallace also testified he recognized the car as the one usually driven by Toliver's mother. Part of the plan involved Brown and Jackson picking up Wallace and taking him to Jackson's house, where they were to keep Wallace there until another person, the killer, would come and take Wallace to be killed.

Brown testified that although he would like to be given a probated sentence, he fully understood there was no agreement in place wherein he would benefit from his testifying against Toliver. The trial court held an extensive hearing out of the presence of the jury during which Tonda Curry, an attorney representing Brown on his conspiracy charge, testified via teleconference because she was out of the state at the time. Curry testified that she and Brown had met with prosecutors, but the only agreement reached concerning any sentence was that when Brown pled guilty to the charge against him, the sentencing judge would be made aware of Brown's cooperation with the State on Toliver's prosecution. It was agreed by both parties and the trial court that the trial judge hearing Toliver's trial would also be presiding over any future plea by Brown.

On appeal, Toliver complains the trial court should have granted Toliver a continuance to secure Curry's presence at trial. We first point out that Curry explicitly testified that there was no

quid pro quo agreement between her client and the State in exchange for Brown's testimony. Curry stated that she believed Brown had "an unreasonable expectation" that he might receive a probated sentence because of his cooperation in Toliver's prosecution, although she had told him that it was "legally possible" to grant probation. However, she was unequivocal that the only agreement, to the extent one existed, was that the judge who would ultimately preside over Brown's case would be made aware of his cooperation in the Toliver prosecution.

Toliver never asked the trial court to grant a continuance for him to get Curry to testify before the jury. After the lengthy teleconference hearing and arguments, Toliver's attorney told the trial court he had not subpoenaed Curry because he did not think he needed to; his counsel said that he did not know until Brown testified that there was the possibility of an agreement for Brown to receive a lesser punishment in exchange for his testimony.[13] However, at no point did he formally request, or by our reading of the record make clear to the trial court, his desire for a continuance.[14] After presenting one defensive witness, counsel "re-urge[d]" his request for a continuance to secure Curry's testimony.

[13]Having reviewed Brown's testimony and the teleconference hearing, we find no indication of any agreement. It is true Brown expected to receive some benefit from his testimony against Toliver. But the record makes clear the only benefit promised by the State, and expected by Brown's counsel, was that the sentencing judge, who would be the same in Toliver's and Brown's cases, would be made aware that Brown cooperated with the State on Toliver's case. There was no agreement for Brown to receive any particular sentence.

[14]Toliver's trial took place October 17–22, 2007; the teleconference hearing with Curry was Friday, October 19. Curry told the court she was in California and would be back in the Smith County area sometime on the afternoon of Tuesday, October 23.

18

Nowhere in the record do we find that Toliver filed a written, sworn request for a continuance. *See* TEX. CODE CRIM. PROC. ANN. arts. 29.03, 29.08 (Vernon 2006). Where a defendant's motion for continuance is neither in writing nor sworn to, nothing is preserved for review. *Dewberry v. State*, 4 S.W.3d 735, 755 (Tex. Crim. App. 1999); *Matamoros v. State*, 901 S.W.2d 470, 478 (Tex. Crim. App. 1995); *Johnson v. State*, 257 S.W.3d 778, 781 (Tex. App.—Texarkana 2008, pet. ref'd) (motion in writing but not sworn, not preserved).

We find that Toliver failed to preserve this matter for appellate review, and accordingly overrule his second point of error.

### 3. Right to Confrontation

In his final point of error, Toliver complains that he was deprived his right of confrontation of a witness when the State introduced evidence of statements made by Toliver's mother, an indicted co-conspirator, to a Tyler police officer. This point is not preserved for appellate review and we overrule it.

On October 8, 2006, after Wallace had been discharged from jail on bond, Tyler police began investigating the suspicious nature of the issuance of the bond. They encountered the white Cadillac reported by Wallace in front of the house of Jackson. When they made contact with Brown, the driver of the Cadillac, he told them that the car belonged to Aldene Dunning, "a lady friend of his," and that Brown was using it with her permission. Brown produced a cellular telephone, called Dunning, and gave the telephone to the officers so they could speak to her and verify that Brown had

19

permission to use the car. Over the telephone, Dunning identified herself and confirmed both that she knew Brown and that she had loaned him the Cadillac. By this juncture in time, the police knew that Dunning had previously arranged for Jackson to be released from jail on bond; on the cellular telephone, the officer asked her about Jackson's whereabouts, but Dunning denied knowing him. When they confronted her with the bonding information, although she admitted bonding out Jackson, she persisted that she neither knew how to locate him nor how to contact him. Brown told officers the cellular telephone actually belonged to Dunning, and she then gave officers permission to look through the contacts stored on the telephone. Stored in the memory of the cellular telephone was evidence that Dunning had placed calls to and received calls from the cellular telephone found earlier that day in Toliver's possession inside the jail. Toliver claims on appeal that Dunning's statements to the police over the cellular telephone were testimonial, as contemplated in *Crawford v. Washington*,[15] and, therefore, Toliver was deprived of his constitutional right to confront witness Dunning, his mother.

Earlier in trial, though, Brown had testified to substantially the same things presented in the officer's recitation of his conversation with Dunning. Brown testified, without any objection by

---

[15]541 U.S. 36, 68 (2004). "Whatever else the term [testimonial] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed."

Toliver, that he was driving a car owned by Toliver's mother, who was Dunning; that Dunning had bonded out Jackson with the intent that Wallace would stay with Jackson until Wallace was killed.

We need not decide whether there was any error in the trial court's admission of statements attributed to Dunning. To preserve error on appeal, the complaining party must make a timely, specific objection and obtain a ruling on the objection. TEX. R. APP. P. 33.1(a); *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). Further, a party must continue to object each time inadmissible evidence is offered. *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991). Because Toliver did not object when the same evidence was admitted via Brown's testimony, this complaint is not preserved for appeal. We overrule Toliver's third point of error.

We affirm the trial court's judgment.


                                                           Bailey C. Moseley
                                                           Justice

Date Submitted:      December 16, 2008
Date Decided:        January 21, 2009

Publish