

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-09-00021-CR
_____

CARL LEONARD LIVELY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 173rd Judicial District Court
Henderson County, Texas
Trial Court No. A-16,142

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

A Henderson County jury found Carl Leonard Lively guilty of the aggravated robbery of the Point 1 Beverage liquor store in Seven Points, Texas, and Lively has perfected his appeal from that conviction.[1]

## **A Robbery in Seven Points, Another in Marshall**

On July 24, 2007, Phan[2] Sim, the proprietress of the Point 1 Beverage reported an armed robbery of her store. Sim reported to police investigators that the perpetrator of the robbery was a white male, about thirty-five to forty-five years of age, who stood about 5'8" to 5'10", and had a slender build. She also described him as having graying hair and mustache and that his hands were shaking. The liquor store had multiple surveillance cameras (both inside the store building and outside the front of the building) from which video recordings were obtained and these video recordings were admitted into evidence. The in-camera clock shows the robbery happened about 4:35 p.m. Sim described the robber as having arrived and then departed in a dark blue sports utility vehicle (SUV) and the recording from the outside camera confirmed that recollection.

About three months after the robbery occurred, police officers presented Sim with a photographic lineup which contained an array of photographs of six mustachioed Caucasian

---

[1]Originally appealed to the Twelfth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Vernon 2005). We are unaware of any conflict between precedent of the Twelfth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[2]Sim said her first name is pronounced "pan."

males. Lively's picture was one of the six. Sim recounted at trial that she looked at the photographic lineup as she performed her clerk duties, waiting on customers of the store; because the robber had worn a baseball cap and sunglasses, she covered the eyes and the tops of the heads of the men in the photographs, finally selecting the picture of Lively as being the person who had robbed her.[3] Although Sim had picked Lively's photograph from the lineup, she was unable to identify him at trial, explaining that a great deal of time had passed, that she had purposely erased as much detail of the robbery as she could from her mind, and that it was difficult for her to distinguish one Caucasian man from another. It was for this robbery that Lively was charged, tried, and convicted.

Only a few days before the Point 1 robbery, Lucky's Liquor in Marshall (Harrison County) was robbed. Allen In, the clerk at Lucky's, described his robber as a white male wearing a hat and a long-sleeved, button-down shirt. Unlike the robbery at Point 1, the robber at Lucky's did not wear sunglasses but, instead, used a bandanna to mask the lower part of his face. However, this ploy was only partially successful because In said the robber only pulled the mask up as he entered the store and therefore In was able to see his face. The robber pulled a pistol from his pants and used it to threaten In, telling him to "empty out the cash register." In noted that the robber was shaking. After getting the money from the cash till, the robber told In to go to the back of the store

---

[3]At trial, Tim Meadows, the officer who showed Sim the photographic lineup, did not recall her waiting on customers while he showed her the lineup. When she testified at trial, Sim said she thought she had looked over the lineup for ten to fifteen minutes. Meadows did not testify as to how long Sim had viewed the lineup; he described her selection of the robber's photograph as "[s]omewhat quick, but not like, off the bat, [']that's him.[']"

3

and In complied; the robber then left. In promptly got his pistol and went outside, where he saw the robber sitting in a dark blue SUV, counting the money. When the robber looked up and saw In pointing his pistol, he sped away in the SUV. Nevertheless, In fired several shots at the fleeing vehicle.

It was October 30, 2007, before Lively came to the attention of law enforcement officers and then only on a matter entirely unrelated to either robbery. Police responded to a minor accident between two vehicles in the parking lot of the Wal-Mart in Gun Barrel City, Henderson County, a neighboring town to Seven Points. There was a minor collision of another vehicle with Lively's blue SUV. Damon Boswell, the first police officer to arrive at the scene, noticed that Lively seemed nervous and did not appear to want to make eye contact with Boswell. Boswell took note of the license plate number on Lively's vehicle and reported it to the police dispatcher; he then began to make contact with Lively and the driver of the other vehicle. Shortly thereafter, Officer Dusty Bryant arrived at the scene. Bryant, a recent hiree with the Gun Barrel City Police Department, had previously been an investigator for the Seven Points Police Department, where he had investigated the Point 1 robbery. In that former capacity, he had viewed the video recordings from the surveillance cameras of the robbed store several times. When he arrived at the Wal-Mart parking lot to assist Boswell, he immediately believed Lively to be the person shown on those video recordings as the robber in the Point 1 robbery. Bryant pointed out Lively's similar appearance to that in the Point 1 video recording, which Boswell had also seen. The officers also

4

took note of the fact that Lively's SUV looked similar to the robber's vehicle in the Point 1 video recording.

About this same time, Boswell was advised by the police dispatcher that the license plate information he had previously called did not correspond with license plates issued for Lively's vehicle. Upon re-checking the numbers on the license plate, Boswell discovered that the SUV now bore a completely different license plate from the one he had seen when he first arrived at the scene. Boswell had also noticed pieces of tape on the SUV's windshield, over the vehicle's identification number and the identifying number on the registration sticker. Boswell testified these clear pieces of tape would prevent surveillance cameras from detecting the identification numbers. In light of all these circumstances and becoming increasingly suspicious, Boswell asked Lively if he could search Lively's SUV, and Lively consented. In the SUV was a briefcase which contained, among other items, a loaded and chambered pistol, four or five Texas license plates, and a screwdriver. Lively was arrested for operating a vehicle with no valid driver's license. Police then inventoried the vehicle and found a sticker on the passenger side door which concealed a hole in the outer skin of the vehicle. After obtaining a search warrant, police searched Lively's SUV, the search revealing a bullet slug in the interior part of the door where the hole had been found. Subsequent testing established that the bullet slug found in the door of Lively's SUV had been fired from the same pistol that In had fired at the vehicle which fled from the robbery in Marshall.

5

**<u>Photographic Lineup Was Not Suggestive</u>**

Lively's first point of error claims the trial court should have granted Lively's motion to suppress wherein Lively sought to have the photographic lineup shown to Sim and the fact that Sim had selected Lively's picture from that lineup excluded from evidence. Lively claims the lineup to have been so impermissibly suggestive that Sim was more likely to select his photograph than the other five in the photographic array.

The record before us contains a color copy of the photographic lineup shown to Sim. We observe the lineup has six photographs, each appearing to be in the kind of format of pictures employed with driver's licenses, showing the face and top of the torso of a Caucasian man, each with a mustache. While Lively argues, and was able to get one State's law enforcement witness to agree, that one subject could possibly be Hispanic, however, this photograph could just as easily be of an Anglo-American as it could be one of an Hispanic. That same witness, on cross-examination, also said the man in the lower right picture could conceivably be of Asian descent, although it is difficult from observation to draw that same conclusion that the witness drew. Lively argues these comments from one witness support his contention that at least two of the lineup subjects were of different ethnic or racial backgrounds than Lively, contributing to what Lively claims to be the impermissibly suggestive nature of the lineup. Lively also maintains that only his picture and that of one other person have any amount of grey hair; we discern, though, at least one other person with touches of grey at the temples.

6

We review the trial court's decision on a motion to suppress evidence by applying a bifurcated standard of review; that is, we defer to the trial court's determination of historical facts that depend on credibility, but we conduct a de novo review of the trial court's application of the law. *Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007); *see also Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). Generally, we review de novo determinations of probable cause after granting deference to the trial court's determination of historical facts. *Guzman*, 955 S.W.2d at 87.

In most cases regarding an allegedly suggestive lineup or photographic lineup, the appellant complains that an in-court identification was contaminated or affected by a prior out-of-court identification in a lineup. *Cf. Loserth v. State*, 963 S.W.2d 770, 771–72 (Tex. Crim. App. 1998). "An in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pretrial photographic identification." *Id*. at 771–72. This appears to be markedly different. Strictly speaking, Lively is not complaining of Sim's in-court identification; indeed, although she was able to identify him from the lineup she was shown before trial, she could not identify him at trial. In the instant situation, we review whether the trial court abused its discretion in refusing Lively's request to suppress the photographic lineup and Sim's identification of Lively.

In considering the trial court's ruling, we take into consideration the criteria for reviewing whether a lineup was impermissibly suggestive. Suggestiveness may be created by the manner in

7

which the pretrial identification procedure is conducted (for example, by police pointing out the suspect or suggesting that a suspect is included in the lineup or photographic array). *Herrera v. State*, 682 S.W.2d 313 (Tex. Crim. App. 1984). Another means of suggestiveness is via the content of the lineup or photographic array itself if the suspect is the only individual closely resembling the pre-procedure description. *See Williams v. State*, 675 S.W.2d 754 (Tex. Crim. App. 1984) (finding no impermissibly suggestive procedure even though most of the participants appeared younger than suspect). Furthermore, an individual procedure may be suggestive or the cumulative effect of the procedures may be suggestive. *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995).

A lineup is considered unduly suggestive if other participants are greatly dissimilar in appearance from the suspect. *Withers v. State*, 902 S.W.2d 122, 125 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (citing *United States v. Wade*, 388 U.S. 218, 232–33 (1967)). For instance, a lineup is deemed suggestive when the accused is placed with persons of distinctly different appearance, race, hair color, height, or age. *Foster v. California*, 394 U.S. 440, 442–43 (1969). However, simple minor discrepancies between lineup participants will not render a lineup unduly suggestive. *Partin v. State*, 635 S.W.2d 923, 926 (Tex. App.—Fort Worth 1982, pet. ref'd). Neither due process nor common sense requires participants in a lineup to be identical. *Buxton v. State*, 699 S.W.2d 212, 216 (Tex. Crim. App. 1985) (finding no suggestive procedure constituting violation of due process, even though men in lineup ranged in height from 5'9" to 6'2", in weight

8

from 175 pounds to 210 pounds, had various skin tones, and wore different types of clothing). In fact, a lineup is not unduly suggestive where there is a weight range of forty pounds or height range of five inches. *Id.* In *Withers*, the defendant was thirty-nine years old, 5'8" tall, weighing 160 pounds, and clean shaven at the time of his identification; the witness's description was of a person 5'6" to 5'7" in height; 150 to 160 pounds; and thirty to thirty-five years of age. The four other persons in the [nonphoto] lineup ranged in age from twenty-one to forty-one, in heights from 5'9" to 6'1", and in weight from 155 to 205 pounds; while two had beards, the others (including the subject) were clean shaven. The Houston court found the lineup and identification were not unduly suggestive. *Withers*, 902 S.W.2d at 125; *see also Turner v. State*, 600 S.W.2d 927, 932 (Tex. Crim. App. [Panel Op.] 1980) (lineup of five persons, two of whom have beards and who are not physically close to defendant in size and hair color, not impermissibly suggestive); *see also Williams v. State*, 675 S.W.2d 754, 757 (Tex. Crim. App. 1984) (defendant appears older than other persons in lineup).

Having reviewed the photographic lineup at issue here, as well as caselaw interpreting similar allegations, we cannot say the lineup shown to Sim was suggestive, much less impermissibly suggestive. Even considering one subject, the gentleman in the upper left photograph, who Lively asserts looks Hispanic, he is not grossly dissimilar to the other men in the array. It is true his skin tone is slightly darker than some of the other subjects, and he has a more pronounced receding hairline, but he clearly is still in the same general range of appearances as the

9

other five photographs, including Lively's. (Note that the head of Sim's robber was covered by a baseball cap and the quantity of hair on the perpetrator's head would have not been apparent to her. Further, Sim testified that when she examined the photographs in the lineup, she covered the top part of the faces and it is presumed that this act would have obscured the bald head as well.) Additionally, Sim clearly said Officer Meadows did nothing to prompt her to select Lively's picture. The trial court did not abuse its discretion in denying Lively's motion to suppress.

**Admission of Extraneous Offense**

Earlier in this opinion, the robbery of Lucky's Liquor which occurred about five days before the charged offense was described. Lively complains the trial court erred in allowing the State to introduce evidence of that robbery. The two crimes had several similar circumstances. In both, the robber was described as a white male in a baseball cap, with grey hair over the ears and a mustache; both robbers wore long-sleeved, button-down shirts, displayed a pistol and demanded money; and the victim-witnesses in both cases described their robbers as shaking. Both robberies occurred in daylight hours if not the afternoon,[4] just a few days apart; and both robbers drove themselves to their heists and fled in a blue SUV. There were also differences between the two crimes. Sim's robber wore sunglasses, whereas In's did not and held a bandanna over his face (although In was able to get a clear look at the robber's face before he raised the bandanna). Sim's robber told her to lie down on the floor; In's told him to go to the back of the store. Most distinctive, under Lively's argument, is the fact that the robberies occurred about 100 miles apart, in two different counties.

Under the Texas Rules of Evidence, evidence of other crimes, wrongs, or acts is not admissible "to prove the character of a person in order to show action in conformity therewith." But it may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." TEX. R. EVID. 404(b).

---

[4]In testified Lucky's was robbed about 4:45 p.m. Although Sim did not give a specific time, the date and time display on the surveillance video from her store shows the robbery occurred at about 4:35 p.m.

11

The exceptions listed under Rule 404(b) are neither mutually exclusive nor collectively exhaustive. *Pondexter v. State*, 942 S.W.2d 577, 583–84 (Tex. Crim. App. 1996). "Rule 404(b) is a rule of inclusion rather than exclusion." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). The rule excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character. *Id.* at 343 (citing *Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996) ("if evidence (1) is introduced for a purpose other than character conformity, (2) has relevance to a 'fact of consequence' in the case and (3) remains free of any other constitutional or statutory prohibitions, it is admissible")). The proponent of uncharged misconduct evidence need not "stuff" a given set of facts into one of the laundry-list exceptions set out in Rule 404(b), but he must be able to explain to the trial court, and to the opponent, the logical and legal rationales that support its admission on a basis other than "bad character" or propensity purpose. *Id.*

"Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court." *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). So, too, is a ruling on the balancing of the probative value against the counter factors set out in Rule 403, although that balance is always slanted toward admission, not exclusion, of otherwise relevant evidence. *See Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1991) (op. on reh'g) (presumption under Rule 403 is that probative value outweighs

12

prejudicial effect "unless in the posture of the particular case the trial court determines otherwise"). Thus, a trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse of discretion standard. *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005). So long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion and the trial court's ruling will be upheld. *Montgomery*, 810 S.W.2d at 391. A trial court's ruling is generally within this zone if the evidence shows that (1) an extraneous transaction is relevant to a material nonpropensity issue, and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997).

The State urged admission of the extraneous robbery at Lucky's on the ground that the identity of the robber at Point 1 was clearly at issue. Lively stressed, through his cross-examination of Sim, that she was unable to identify Lively, in court, as her robber. Further, she acknowledged that when she selected Lively's picture in the photographic lineup, she was not "100%" certain he was the robber.[5]

---

[5]It bears noting that it is clear from the reporter's record Sim had some difficulty understanding some questions and on occasion making herself understood to the attorneys questioning her. Sim was a native of Cambodia, where she had lived until age twenty-seven; at the time of trial, she had been in the United States about twenty-six years. Even so, Sim was not reticent to make it explicitly plain when she did not understand a question and was an obviously competent witness.

13

In *Taylor v. State*, 920 S.W.2d 319, 322 (Tex. Crim. App. 1996), no error was found when an extraneous robbery-murder was held admissible where it occurred a few blocks from where the charged capital murder occurred; both victims were elderly and strangled with a wire coat hanger. In *Burton v. State*, 230 S.W.3d 846, 848–51 (Tex. App.—Houston [14th Dist.] 2007, no pet.), the defendant confessed to robbing several Houston-area banks. The State charged him with one robbery, then introduced two extraneous cases. In his confession, Burton had told police his general method of robbing banks: he made certain there was no on-site security, he approached young tellers who he did not think would protest or argue, he wore a hat and sunglasses, and presented a note demanding money. In opposing introduction of the extraneous offenses, Burton stressed variations in clothing (other than the hat and sunglasses): that he used a toy gun in one offense and took smaller denominations of bills in one case. Nevertheless, the appellate court found no error in admission of the extraneous crimes.

In *Siqueiros v. State*, 685 S.W.2d 68, 70–71 (Tex. Crim. App. 1985), the defense impeached the complainant's identification, pointing out the existence of poor lighting in the room where she was raped which would hinder identification, inconsistencies in her initial description of her assailant, and the fact that she had consumed beer and marihuana before going to bed. Further, while picking out the defendant's picture from a photographic lineup, she expressed to police that she could not be positive in her identification. Both the charged offense and the extraneous crime involved sexual attacks on fifteen-year-old girls, asleep alone in their bedrooms

14

at about 3:00 a.m.; in both cases, the assailant had entered through a bedroom window, put his hand over the girls' mouths and told them that he would kill them if they resisted and that he had a knife. Both victims identified Siqueiros as their attacker. Siqueiros's fingerprints were found at the scene of the extraneous crime. Although latent fingerprints were found at the scene of the primary offense, they could not be identified as Siqueiros's. The Texas Court of Criminal Appeals held the extraneous offense was admissible regarding identity. *Id.* at 72.

We find the trial court did not abuse its discretion in finding evidence of the extraneous-offense robbery to be relevant to the case at hand. There were several similarities, as well as a few differences. Looked at *in toto*, though, there are sufficient commonalities between the two offenses such that the trial court's admission was clearly within the zone of reasonable disagreement. Accordingly, we will not disturb the trial court's finding of admissibility.

## 403 Balancing

Lively also complains that even if it is determined that the issue of identity was raised and the extraneous offense was therefore relevant and admissible, the probative value of the other robbery was substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403. The relevant criteria in determining whether the prejudice of an extraneous offense substantially outweighs its probative value include:

> (1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable--a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense;

15

(2) the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way";

(3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; [and]

(4) the force of the proponent's need for this evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.

*Santellan*, 939 S.W.2d at 169 (footnote omitted) (citing *Montgomery*, 810 S.W.2d at 389–90).

### *Did the Extraneous Offense Make a Fact of Consequence More or Less Probable?*

We find the first factor weighs in favor of admission of the extraneous offense. There were several marked similarities between the two robberies. In's identification of his robber, coupled with the evidence that a bullet fired from In's pistol was found in Lively's truck, provided compelling evidence that Lively committed that robbery. Lively's involvement with that robbery made a fact of consequence (i.e., whether Lively robbed Point 1) more likely, as both robbers had features and dress in common (middle-aged white man with a mustache; long-sleeved, button-down shirt; baseball cap); both tried to hide their faces; were described as shaking; brandished a pistol; and were seen leaving and departing in a blue SUV.

### *Did the Extraneous Offense Have the Potential to Impress the Jury in an "irrational . . . indelible way"?*

Arguably, Lively was forced to defend against a second charge for which he had not been indicted, a crime which, at oral argument, the State admitted was the stronger of the two cases.

16

However, the standard in examining this factor is whether the evidence of the extraneous conduct unfairly prejudiced the defendant. *See Manning v. State*, 114 S.W.3d 922, 928 (Tex. Crim. App. 2003). "Evidence is unfairly prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justifies its admission into evidence." *Casey v. State*, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007) (citation omitted). We have already discussed how the Lucky's robbery was admissible to prove identity in the primary offense. We find nothing in the record to suggest the extraneous-offense evidence, "concededly relevant evidence," acted "to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). This factor argues in favor of admission.

### Time Spent by Proponent of the Evidence

The State's case-in-chief consumed over two days, having about 130.5 pages of direct examination of State's witnesses.[6] Of this time, approximately 42.5 pages of direct examination during the trial was addressed to witnesses proving up the extraneous offense at Lucky's Liquor. Thus, by our reckoning, the State spent about thirty-three percent of its time on the extraneous offense.

We find this factor weighs against admission. *Compare Toliver v. State*, 279 S.W.3d 391, 398–99 (Tex. App.—Texarkana 2009, pet. ref'd) (about twenty-three percent of direct

---

[6]In reaching this figure, we have excluded voir dire of witnesses, arguments, bench conferences, and of course cross-examination by Lively.

testimony toward extraneous weighs against admission); *Russell v. State*, 113 S.W.3d 530, 546 (Tex. App.—Fort Worth 2003, pet. ref'd) (almost thirty percent of trial testimony [the opinion does not specify if the appellate court considered only direct testimony proving up one of two extraneous offenses weighed against admission]).

***Proponent's Need for the Extraneous Evidence***

The fourth factor to be considered is "the force of the proponent's need for this evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute." *De La Paz*, 279 S.W.3d at 349 (quoting *Wyatt v. State*, 23 S.W.3d 18, 26 (Tex. Crim. App. 2000)).[7] As has been said, identity was clearly at issue, and Lively's defensive theory was to contest the State's evidence that Lively was the perpetrator of the robbery. Lively persistently attacked Sim's certainty of identification and offered an alibi for his presence at the time the robbery took place. Although three law enforcement officers said they had reviewed the surveillance video recording and concluded that Lively was the Point 1 robber (a conclusion at which the jury, having also viewed the recording, could have likewise arrived), Sim, the victim, was less certain than they and could not identify Lively in court. Based on these circumstances, this factor weighs in favor of admission.

Reviewing the totality of the circumstances and bearing in mind that there exists a presumption in favor of admission of relevant evidence,[8] we find the trial court did not err in admitting evidence of the Lucky's Liquor robbery. Lively's point of error is overruled.

---

[7]Admittedly, in some respects, weighing this factor in favor of admission of evidence of the extraneous offense instead of against it seems somewhat incongruous. Nevertheless, we are bound to consider it in such fashion.

[8]*McFarland v. State*, 845 S.W.2d 824, 837 (Tex. Crim. App. 1992); *Montgomery*, 810 S.W.2d at 388.

## Sufficiency of Evidence

### *Standards of Review*

Lively's third and fourth points of error complain the evidence was legally and factually insufficient to support the jury's verdict, respectively. In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). In a legal sufficiency review, we must defer to the jury's ability to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from the evidence. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

In contrast to a legal sufficiency review, when conducting a factual sufficiency review, all evidence is viewed in a neutral light, favoring neither party. *Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We are to determine if the evidence supporting the verdict, although legally sufficient, is nevertheless so weak that the verdict is clearly wrong or manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Watson*, 204 S.W.3d at 414–15. While a factual sufficiency review allows a very limited degree of "second-guessing" the jury, the review should be deferential, maintaining a high level of skepticism about the jury's verdict before

20

a reversal can occur. *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); *Watson*, 204 S.W.3d at 417.

A review of both the legal sufficiency and the factual sufficiency of the evidence should be measured by the elements of the offense as defined by a hypothetically-correct jury charge. *Grotti v. State*, 273 S.W.3d 273 (Tex. Crim. App. 2008); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Villarreal v. State*, 286 S.W.3d 321 (Tex. Crim. App. 2009); *Malik*, 953 S.W.2d at 240. Lively makes no assertion the charge in this case was in any way deficient or incorrect.

In Lively's case, the State had to prove that (1) Lively (2) committed theft of property; (3) intended to obtain or maintain control over that property; (4) intentionally or knowingly threatened or placed Sim in fear of imminent bodily injury or death; (5) while exhibiting or using a deadly weapon (here, a firearm). Lively's appellate challenges to the sufficiency of the evidence center on identity: Sim's identification of Lively in the photographic lineup and law enforcement's investigation, contravention of his presence at the liquor store on the day of the robbery as provided by Lively's alibi witness, and the quality of investigation done by law enforcement. Lively does not challenge the second, third, or fourth elements stated above.

### The Evidence Is Legally Sufficient

Sim, the proprietress of the robbed Point 1 Beverage liquor store, failed to make an in-court identification of Lively. At trial and on appeal, Lively makes much of the cross-examination of Sim where she appeared less than certain when she picked Lively's picture out of the photographic array. At trial, Sim said that when she picked Lively's picture from the photographic array, she was "[n]ot 100 percent sure. But I think that guy." Under these points of error, Lively again emphasizes what he views as the overly suggestive nature of the photographic lineup shown to Sim.

Notwithstanding weaknesses in Sim's identification, there was other substantial evidence supporting the jury's verdict. The video recordings from the Point 1 surveillance cameras were introduced and these recordings showed the face of the robber from three different angles; the exterior camera shows the robber's SUV, a vehicle which matches the description of the one driven by Lively. The bottom of the robber's face can be seen, which the jurors could compare to the pictures of Lively in the lineup and by his truck in the Wal-Mart parking lot three months after the robbery and to the face of Lively as seen in the courtroom. In addition, three still photographs from the video were admitted which the jury could compare. Three law enforcement officers, Boswell, Bryant, and Meadows, each testified that they had viewed the video and were sure, when they saw Lively at the Wal-Mart parking lot three months after the robbery, that he was the robber in the video recording.[9] There was strong circumstantial evidence that Lively changed the license

---

[9]Boswell was "90 percent sure"—Meadows and Bryant "100 percent."

22

plates on his SUV after the motor vehicle accident at the Wal-Mart parking lot, plus Lively was in possession of several other license plates, a screwdriver, and a pistol at that time. Lively was described as "overtly nervous . . . stand-offish" and behaving as though he "didn't . . . really [want] to be there" as soon as Boswell made contact with him. Boswell also noted Lively's demeanor was different from what Boswell encountered where people had been in a wreck; Lively acted more nervous than upset and would not make eye contact with the officer. All of these pieces of evidence support the verdict. Finally, the evidence of the robbery at Lucky's Liquor, which we have found properly admitted, supports the jury's finding that Lively was the Point 1 robber. We find the evidence to be legally sufficient to support the jury's verdict.

### *Factual Sufficiency*

For review of the factual sufficiency of the evidence, we must consider all the evidence, including that contrary to the verdict. On appeal, Lively points to Sim's uncertain identification; Lively's alibi witness; and shortcomings in law enforcement's investigation, including failing to pursue two other suspects, as rendering the verdict clearly wrong or unjust.

We have discussed at length Sim's identification. Regarding a review of the factual sufficiency of the evidence, the strongest evidence contrary to the verdict was Lively's alibi witness. Martin Steed said his birthday was July 23 and that on July 24, 2007 (the day the Point 1 robbery occurred), Lively and his female companion spent the entire afternoon that day with Steed. Steed testified he, Lively, and Lively's companion were together from late that morning

until about 10:00 p.m. that night. He testified that the three of them drove around locations in Harrison County, but never went to Henderson County. It is the jury's prerogative to believe or disbelieve contradictory testimonial evidence, which turns on an evaluation of credibility and demeanor. *Johnson v. State*, 176 S.W.3d 74, 78 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (jury free to reject defendant's alibi defense); *Escovedo v. State*, 902 S.W.2d 109, 115 (Tex. App.—[1st Dist.] 1995, pet. ref'd) ("The jury may believe or disbelieve all or any part of a witness' testimony."). Steed also acknowledged that while he was aware about November 2007 that Lively had been arrested, he never contacted police or prosecutors with this exculpatory information until Lively's attorney called a month before trial (trial was October 2008). Although Steed spoke with a detective in November 2007, he made no mention of this day spent with Lively. The simple fact that contrary evidence exists is not enough to support a finding of factual insufficiency. *See Goodman v. State*, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001).

Through cross-examination of law enforcement witnesses, Lively also pointed out that there were possibly two other suspects, although those were ruled out as suspects by law enforcement officers during the course of their investigation. Investigator Bryant said law enforcement found one person with a Tahoe with a license plate similar to the one given law enforcement by Sim after her store was robbed; officers ruled that person out after seeing his driver's license photograph and determining the truck was the wrong color. Lively complains that the police did not contact that vehicle owner to ask if the vehicle had recently been painted or

if the owner had loaned the vehicle to someone else. The State is not required to disprove a reasonable alternative hypothesis. *Dade v. State*, 848 S.W.2d 830, 832 (Tex. App.—Houston [14th Dist.] 1993, no pet.).

About a month after the Point 1 robbery, police also received a tip from a woman working at a local golf course who thought one of the patrons of that course could be the Point 1 robber. Bryant went to the golf course and saw the man, but eliminated him as a suspect because Bryant did not believe that the man to whom he had been alerted resembled the robber in the video. Lively complains that Bryant did not remember, at trial, that man's hair color or whether he had a mustache. He further points out that the police did not determine what kind of vehicle the man drove or where he had been the day of the robbery. Again, the existence of an "alternative reasonable hypothesis" does not render the evidence factually insufficient. *Richardson v. State*, 973 S.W.2d 384, 387 (Tex. App.—Dallas 1998, no pet.).

Lively also complains that Bryant was "overanxious" to find the robber. The full quote from Meadows was in answer to questions about why, after drawing up as many as three photographic lineups other than the one shown to Sim, Bryant did not show those lineups to Sim. Chief Meadows responded, "Mr. Bryant was, the best way of saying it, overanxious to find the suspect, and everyone that he thought would be, he would do a criminal history, photo lineup, and then ask me or the chief at that time what we thought. And it was dropped at that point."

Lively also complains (1) that the police made no attempt to obtain any surveillance video recordings from the Wal-Mart parking lot, which might determine if Lively had changed the license plate; (2) that there was no testimony whether the SUV at the Point 1 robbery had a bug shield on the front (as did Lively's SUV); (3) that no DNA evidence or hair fibers were sought (officers did try to get fingerprints from the cash drawer the robber touched, but only smudges were present). The cap worn by the robber was never found; no tire mark evidence was sought at the scene, and the license plate number Sim reported seeing on the fleeing truck was never located. Some of these matters were explained at trial. There was no indication Sim saw the front of her robber's truck; the surveillance video of Point 1's parking lot did not offer a good view of the vehicle's front. There was no evidence any surveillance video from the Wal-Mart parking lot existed. As to no evidence of tire marks being acquired, Bryant did say on re-direct examination it was neither possible to get tire mark evidence from the concrete drive, nor could footprints be obtained. Lively cannot be faulted for calling into question the thoroughness of the law enforcement investigation. Despite that, he has not demonstrated that there was contrary evidence which rendered the jury's verdict clearly wrong or manifestly unjust.

We find the evidence factually sufficient to support the jury's verdict. We overrule Lively's fourth point of error and affirm the trial court's judgment and conviction.

Bailey C. Moseley

26

Justice

Date Submitted:     January 13, 2010
Date Decided:     February 5, 2010

Do Not Publish